Good afternoon, your honors. May it please the court, Christy Hughes on behalf of Mr. Cebrero. The state court's decision denying Mr. Cebrero's three claims wasn't just wrong, it was objectively unreasonable, and that this court should reverse the district court's denial of the writ. I'd like to start with the state court's decision on the claim that there was unreasonably applied the clearly established law in Tyson and determining that Mr. Cebrero wasn't a major participant or wasn't. It doesn't apply here as federal constitutional law, does it? Pardon your honor? Tyson doesn't apply here as federal constitutional law because it's not a death penalty case. Is that right? I disagree, your honor. So California has sort of a weird statute in that you only qualify for life without parole, which Mr. Cebrero is serving, if you qualify for the death penalty. And so that was what the California Supreme Court clarified in banks was that the Tyson standard applies for its major participant, the major participant standard in its felony murder statute because you can only qualify for life without parole if you first qualify for the death penalty. And so the major participant standard in Tyson, which applies for still a state law construction that says essentially, we don't want to do this twice. So we're going to apply the Tyson standard as a special circumstance because the decision, whether it's life or capital punishment only comes after that. So we're going to apply Tyson, but that's a I still think Tyson applies because Tyson is what level of evidence is constitutionally required for someone who is death eligible for someone who is a non-killer who is still death eligible. And that is still Mr. Cebrero. He is a non-killer who is serving this death eligible felony murder circumstance. If however, this court disagrees, I think the analysis is still the same. We have a different federal law that the state court misapplied the sufficiency standard in Jackson and the due process clause because there was no way that a reasonable jury could have found beyond a reasonable doubt that Mr. Cebrero was a major participant. The bank standard. Why is that? Are you going to move to the Jackson standard now? Is that what we're going to talk about? Yes. Okay. Why is it? Why is that the case that no reasonable jury could find? Because that Tyson standard still applies because it's incorporated into the bank standard for a major participant for California special circumstance, major participant. And so the conduct that the Tyson brothers engaged in that actively engaged in every element of the crime is still the standard that we're to judge major participants against. And the state court... The California court says so, or because the United States Supreme Court says so. I mean, this is my problem. I'm trying to figure out what law articulated by the United States Supreme Court you're relying on. Well, I still contend that Tyson applies here because Mr. Cebrero is a non-killer who's serving this death eligible felony murder special circumstance. Okay. But is that because you think the California court has baked Tyson in? Is that your position? No, I still think Tyson applies just because that's the constitutional standard that's required before you're going. I don't know what difference it makes. It's still a sufficiency of the evidence Jackson argument, and it still incorporates the Tyson standard because that's what this California court says. There's some clarifying to get one to me that it comes in through that route rather than directly, but we're still in the same place, aren't we? Under the Tyson standard, was there sufficient evidence for Jackson purposes, which is a very tough step. Yes, your honor is correct. I think if you say that the Tyson standard is a federal law that applies, or if you say that it's the Jackson sufficiency standard that applies, we're still in the same place because those Tyson major participant factors are the same I'm not sure I agree with you on that, but let's turn the page and get to your argument because I think I've taken you on a detour. Why is it you think no reasonable juror could decide on this evidence that he satisfies the standard, please? So when the court went through and looked at whether he was a major participant, it overlooked several facts in the record. It overlooked the fact that he didn't participate in any of the planning, that he didn't supply any weapons, he didn't use a weapon himself, he didn't provide the gasoline. He was planning, he was there talking to people before they drove away. And so he had something to do with the, well, there's no evidence that arguably had something to do or could be inferred to have something to do with the decision to go after this person in the first place, in some respect. Is your honor talking about the point where she's already in the trunk and they're having the discussion? And the second thing is that she was, he was involved in the incident where she didn't pay for the marijuana. He was directly involved in that. And supposedly the whole point of this was because the whole trigger here was that she didn't pay for that marijuana and they want to see that she did. Right. So that's what happens at 10 o'clock in the morning. He goes to drop her off to sell the marijuana and she doesn't pay for him and he then leaves. Then there's all these intervening series of events that he's not involved in. Wait a minute, isn't the next event though, I think he might go to planning. I'm not trying to get in your way, but isn't he involved? When they decide to call Valencia, Valencia is going to know what to do. He's the one who reports back to the owner of the marijuana that it wasn't paid for. And is he not involved in all of that? Well, he's sitting there. He's not really discussing it. It's his roommate's brother's marijuana. So he says they're kind of having this discussion. He is present for it, but he's not participating in it. He's not saying, yeah, you need to get the marijuana back. He doesn't go for it. He doesn't ask them to get, doesn't go with them. He doesn't ask them to get it back. It's this Urbano and Tornillo. Those are the two brothers. They say, do you know anyone who can help us out? They're the ones that call Reyes. He then goes with them. He says, I know this Valencia guy. It's kind of his thing. They all leave. Mr. Sobrero doesn't go with them. He doesn't ask. Did they take his car? Did they take Sobrero's car at that point? Not at that point. No. When did they first decide to take Sobrero's car? That's not till much later in the night. When, when, please, when, please. That's at nighttime. Then Urbano comes back later that night. I think it's at 8 p.m. And he says, there's, there's two, there's, there's different reasons, or there's, there's conflicting evidence about why they took it. So Mr. Sobrero says that Urbano asked for his car to run an errand, didn't tell him what it was going to be used for. He said, yes, Esparza, who's the sort of jailhouse says, Mr. Sobrero gave him the car because he wanted to demonstrate that he wasn't in on stealing any of the money or stealing the marijuana. All that believable, but, or believable at all, but, but we have to look at the evidence as if. I agree. But even Esparza says that Mr. Sobrero didn't know at that point. But he's also the one who said that he took, at the scene, took the girl, the victim out of the car, which was a pretty big deal. No one else said it, but he said it. And I guess that's evidence. It is your honor, but I think what's important and what is in contrast to the Tyson brothers is at that point, there's no evidence that he knew what he was taking her out of the car for. It's not clear at that point, whether they're going to leave her there, whether they're going to be beating her up, whether they're going to question her. At that point, holding a bottle full of gasoline and Valencia already procured this bottle of gasoline. He does have the gasoline, but it's not clear that he's going to spray her with it. It's not quite clear what's going to be done. It's not clear if there's ever a discussion about what's going to be done. So counsel, then this horrific thing happens, right? And then in the aftermath, do we consider any of his conduct in the aftermath, not rendering aid? We know she survived. We do. And I agree that that's one of the factors, but we also have to compare that to the Tyson brothers. And they are just much more egregious. They're just not rendering aid. They're engaging in the shootout with police. They're leaving the cars outside the prison to help their father escape. They're bringing the ice chest of weapons in. Yes, but they had the same argument, which they had basically the same argument. They break their dad and the other guy out of prison. They armed them. They flagged down the car of the innocent family. They had the same argument that they didn't know what their dad and this other convict were going to do until they did it. So I'm not sure that the distinctions you're making are helping me very much, given. Well, even if we take the knowledge part out of it, I think they were engaged in just much more active conduct. I mean, they themselves were procuring the weapons. They don't, Mr. Cerrero. I'll grant you that. I'll grant you that. Could I? And again, I don't want to take too much of your time, but I'm not sure I understand your analysis about I undertake. I understand your argument to be that your client didn't know what was going to happen, didn't help with the plan, didn't necessarily know what they were going to do with the gasoline, even though he helped carry her into a boat. But after they set a fire, I don't know that he helped carry the boat. But OK, after that, after she was set afire, what is the answer to the question about whether we should consider his conduct after that? Because at that point he knew clearly what was happening and it was horrendous. So then what? The answer is yes, we do consider it. And I think that we need to consider it in comparison to other after the fact conduct like the Tyson brothers. And so that's why I was trying to explain to your honor after the fact in Tyson, they're engaging with an armed shootout. I mean, that's what I was trying to explain. And that's much more egregious. That's much more violent, active participation than leaving and not rendering aid. There's also the threat that's on the record from Valencia saying, do you want to stay here and be like her or do you want to get in the car and be like us? And that's right. I thought I thought I have questions about that. I thought at least the state court of appeals said that that's not actually what he said was said, that that was put in by the police officer. But what he actually said was, do you want to stay here? But he didn't say, oh, do you want to be like her? That was an addition by the interrogating officer with the translator. But it wasn't what was said. Is that true or not? I couldn't tell. I do think there's a little bit of a dispute from the translation, whether or not the officer is I mean, the translation, as I went back to the record, it's a little bit confusing as to because the officer is translating as they're going through. It's not like a court certified translation. And so it's not clear. Are they threatening him to stay here with her, be like her? That part is not clear. They're definitely threatening to leave him behind with her. It's not clear what they're saying. Do you want to stay behind? But he says no. And the question was, was he threatened that if he stayed behind, something was going to happen to him again? You have a sufficiency. This is sufficiency of the evidence. And there's a view of the evidence that that wasn't said. Then you've got a problem. I understand that, Your Honor. My my only point is, even if it even if he did. And I agree he did. The view of the evidence is he did leave with them. He did leave for her behind. He didn't render aid. But we have to compare that to the very active and violent undertaking. Do you know whether he did that because he was threatened or not threatened? It is. I mean, he's been threatened all along the way to to get in the car with them, to remain silent. He's even been threatened. There's a threat to get in the car with him. Pardon, Your Honor. When was he threatened to get in the car with him? Well, this is the implicit threat, which sort of is part of my next argument about duress, where Valencia is going up to him and grabbing his sleeve and yelling at him. And the argument was that the California state court had ignored all of the surrounding circumstances that contributed to finding an implicit threat. The fact that when he's grabbing his arm and walking him back to the car and yelling at him, there's also a woman bound in the trunk. There's a gun in the car. Valencia is high on meth. He's been up for days. He's this gang member. He's already explicitly threatened him not to talk. Valencia's also violent group of, you know, friends is also around as sort of backup for him. And all of that is leading to an implicit threat that he needs to participate and get in the car with them, or his life is also going to be in danger. I see I only have a minute and a half left. I have one question. We'll give you a minute or two. I've been wondering whether there's any interaction between the duress issue and the sufficiency on the major participant problem. Because the one thing we know he was threatened about was not to say anything. So with regard to the major participant issue, some of why he was said to be a major participant is because he didn't object. He didn't complain. And so on. But he'd already been told if he said anything, he was in danger of being killed. So you don't quite make this argument. And it may be because the duress doesn't apply to murder. So it only applies to the underlying felony. And so it may be that the major participant issue is really the culpability for the murder, and it doesn't apply. But I was, to me, the most interesting and intriguing thing is there seemed to be some way these two things were running at each other because some of the evidence relied on as to why he was a major participant seemed to be things that he was threatened not to do. Well, I tried to weave that in a little bit. Apparently, I didn't make it very clear. But I mean, all of, I view a lot of what he was doing was just standing there passively. I mean, he was really, he was in the backseat of his own car along for the ride for much of this. And I understand, you know, he is helping get her get out of the trunk. And I understand he started this whole thing. But for a lot of it, he's present. And the state court is basing this major participant finding on him being present while other people are doing other things. He doesn't object. He all passive actions. And like Your Honor says, he was told, don't even make a peep. She's going to recognize your voice. Don't say anything. That's right. And I think that's right. So that on this evidence, I think a fact finder could decide that he wasn't a major participant. I'm trying to figure out why. That's not the burden you're looking at with Jackson, right? It's just the opposite. So why was it on? Why would we say this finding is unreasonable? Reasonable juror could not find. I'm sorry, Your Honor. Can you repeat that question? Well, just maybe I'm just stating the obvious, but it just seems to me from this evidence, what your argument is, is that the jury could have gone the other way. A fact finder could have gone the other way on major participant, but they didn't. And the burden of proof that you've got here is really tough. Why was this finding? Why would a reasonable jury couldn't decide this? Because what? Because I just think the standard that was established in Tyson, I mean, that was a crime with like 10 different active violence steps in it. And those Tyson brothers are actively involved in every single step. Is Tyson the minimum for major participant or an example of major participant? I think it's an example. I don't think it's the minimum. But even if he's slightly around Tyson, I mean, I just don't think he comes close. He's definitely not Edmond. I can see that. But I just think he's nowhere close to Tyson. The few, you know, he let his car be loaned. He drove her 12 hours before he ever gets back involved. And he helps take her out of the trunk, which Valencia orders him to do. And there's no evidence he even knew that he was getting what he was getting out of the trunk for. That's just so far afield from the Tyson's engaging in this detailed planning and preparation, being willing to kill themselves if it came to that. I mean, they knew what they were getting into. They break into the prison themselves. They just are actively involved at every single detailed point of that crime. And Mr. Sobrero is just nowhere close to that. And folding in the duress on top of it, I just think makes it even a stronger case that a reasonable jury just could not find that he met that standard. I see I'm way over my time. I apologize. Thank you, Your Honor. Well, how long he has to say it in. Mr. O'Connor, you just went dark for some reason. Yes, I'm having a hard time. I'm unmuting my video here. Can you hear me at least? Yes, we can hear you. I don't know what the problem is with my video, frankly. We just had your video a second ago. I did. There you are. Yeah, don't touch anything. You can see me and you can hear me. Okay, very good. So initially, I would just like to say that the question of what comprises the elements of California special circumstance is a matter of state law and should not be re-litigated. But I did want to go into the issue of sufficiency of the evidence. And first, I'd like to point out that by his own admission, defendants suspected that the discussion between Reyes and Ortega could mean regarding the victim could mean that they were going to kill her. Can I ask you about that? That evidence, I think, is important. Can you tell me where is it in the timeline? At what point? Sure. So this would have been after he transported the victim and the marijuana and after he dropped off the victim at house to sell the marijuana. And after the victim came back and he asked her, where's the money? But that's still morning, right? It's hours earlier, isn't it? Right, correct. So the defendant learns from the victim she does not have the money or the marijuana. So the defendant then reports to Reyes and Ortega that the victim did not produce the money. Right. Do we know what time that happened? Well, I mean, it's early in the process. It's, you know, it's hard to say whether it's the morning or. OK, I think you have the same problem with the timeline. I do. I understand the sequence. I was trying to nail down how many hours. But thank you. It's very early in the process. Like I say, he informs Reyes and Ortega about the missing money. That starts the whole ordeal. He overhears this conversation between Reyes and Ortega and he hears them say, well, we can't leave things the way they are. Reyes said he knew somebody who could do them a favor. The defendant said he did not know what they meant, but he thought it could mean that they could kill the victim. OK, and we can infer that this was before the victim was kidnapped. This was before the defendant lent his car to his confederate. Yes. That statement comes from his statement to the police. That's his statement to the police. Correct. Yes. He said a lot of things to the police. Yes. Correct. Correct. And additionally, there's some additional evidence that this conversation occurred before he lent his car to the Confederates. Defendant admitted he was present when Ortega found out the victim had not paid for the drugs. Ortega became angry and said the victim had done him wrong. And he called Reyes for a favor. Reyes said he knew somebody who could do the favor. And so Reyes and Ortega then left to meet Valencia. So, again, that was early in the process before the defendant lent his car to his confederates. So that's all evidence of reckless indifference. It's all evidence that the defendant was aware of the possibility that the victim could be killed before he lent his car to his confederates. So it's evidence of reckless indifference. It's also evidence of major participation. But that wouldn't be enough. I mean, wouldn't that category, if everything had stopped there, then we'd certainly be on the other side of the Tyson line. Right. There's a lot more evidence of reckless indifference, a lot more evidence of major participation. I'll give you another item of evidence. Defendant admitted to Esparza that he loaned his car to the others to prove he was not involved in the disappearance of the drugs. The jury was entitled to infer the defendant loaned his car to the others, knowing the victim would be kidnapped. So the defendant met the other men at a gas station. The men were trying to hold him responsible for the disappearance of the drugs. The men asked him to loan them his car and they were going to get the drugs back from the victim. The defendant was told he had to drop off his car so the others would kidnap the victim. The defendant claimed he did not know what was going to happen, but he did let the others borrow his car. And again, you know, he overheard this conversation between Reyes and Ortega earlier, where it happened and he hadn't been physically present. I'm sorry, Your Honor. I think you're right. I said, I said that if the, it was just the way you said it that I thought was funny, but it sounds like you were talking to a child. I'm sorry. But if all that had happened and he hadn't been in the car and physically present during the murder, I still think you'd be on the other side of the Tyson line. You're just building up. So you're not arguing all of this. Up to that point, he would have been a major participant. Up to that point, all you have is he lent somebody his car for something he thought was probably going to be or could have been a murder. Well, yeah, I think, I think at the very least, I think at this point, we would have reckless indifference. You know, we might have major participation. I mean, this was a kidnapping. You know, the defendant had reason to believe that this was a kidnapping and it could result in a murder. And here he's providing the instrumentality of the kidnapping, the car. So that is, that is a major, you know, a major element of participation there. But there is, there is more both in terms of major participation and reckless indifference. Um, you know, I mean, he was present at the planning stage at the Sycamore house when, uh, defendants having a conversation with Ortega and Valencia. That's when Valencia is holding the bottle of gasoline, you know, where it's, it's obvious that, uh, Valencia intends to, um, uh, you know, pour the gasoline on the victim and kill her, at least seriously burn her or threaten to, I'm not sure why it's obvious that he would have done what he did. Uh, it's certainly a threat and implied threat, but I don't know about obvious counsel on that point. Right. It's at least reasonable to think that, that Valencia will pour the gasoline on the victim and, and, uh, uh, burn her or something like that. Um, it's at that point that I begin to before, just after he, he got the gasoline in the bottle. Um, um, Valencia, um, told the defendant not, or the petitioner, um, not to say anything or he, he treated us like her. So at that point, what's he supposed to do? Um, if he can't say anything, well, can't say we shouldn't be doing this and he can't say, um, I don't want any part of us and he can't say, um, I don't want to get in the car. I mean, he can't, he, anything he says can get him killed. Right. Well, let me, let me just, just say a few words about the, the state law defense of duress. And, um, you know, it, it requires, uh, you know, uh, the president active threat of imminent danger, and it requires a demand to participate in a crime. So that was the second I didn't hear that. Oh, it, it, uh, there's a, uh, there has to be a demand that the defendant participate in the crime. Okay. So, um, but, but you see this crime, at least the major participant part of it is being defined in part by whether he spoke up. So it seems to be some element of, of, of, of this part of the special circumstance that he has to speak up. Well, that's what he can do for all that killed. Well, just, just to be, just to be clear on this point, um, Valencia's threats as, as related by defendant, we have to keep that in mind that these it's defendant relating these alleged threats, but anyway, um, the threats concern, the consequences for you speaking with a victim could hear his voice and potentially identify him, uh, or telling others about the crime. So those were still advanced. You can't talk. Well, so how could he say, um, you know, I don't want to do this or you shouldn't be doing this or I don't want any part of this or anything. I don't think that's correct. Um, for example, I think that when, uh, defendant was talking to Valencia and Ortega at the sycamore house, when Valencia had the bottle of gasoline and Freeman were talking, I mean, at that point, defendant could have said, you know, I think this is a bad idea. I do not think we should pour gasoline on the victim. You know, that type of thing. Was there a word next to the car at that point? I'm sorry. You weren't near the car or the, uh, well, that was at the sycamore house. I think the, I think they were away from, right. They were in a field away from the victim away from the car. I mean, so how many minutes out? I think my understanding of the duress instruction had been requested that he would have to show his life was immediately threatened. And I don't, again, on the timeline, it's hard to get a sense of. Right. Well, present, yeah. Present and active threat of imminent danger. So it does have to be, it does have to be an imminent threat under state law. Counsel, that's the part I know. What I'm asking about is factually, oh, what's the, can you help me out with how, what is the duration? What, uh, either temporally or geographically between that statement and her being lit on fire? Let's see, I think, I mean, I'm not sure I can give you an exact timeframe, but I think the, the, the comments about, you know, uh, defendants should be quiet. So the victim doesn't, does not recognize his voice. Um, I think those comments occurred before the planning session at the sycamore house. And so she was in the trunk. She was in the trunk. Yeah. He was in the trunk. Correct. Yes. And then if they occurred, if they occurred, well, after she was in the trunk, how much distance could there have been temporarily? Um, well, I'm not, I'm not entirely sure if I can give you an exact timeframe, but I know there was, you know, she was, she was in the trunk of the car. And I think, you know, that's when Valencia made these statements about don't speak when the victim can hear you, you know, cause she might recognize your voice essentially. And then there was the planning session at the sycamore house. And then, uh, Valencia and Ortega and defendant got into the car and drove to the murder scene. And hold on a second. Hold on a second. We lost judge. Um, Kristen, I don't, I don't see her. Does anybody see her square? Looks like we may have lost her. Oh, this happened yesterday. Unfortunately. I judge I'm looking into it, but it looks like she has disconnected for now. I'll try to get her back on as soon as I can. I would rather not go forward. Apparently she did miss miss a chunk of the argument yesterday, judge Beatty. And, um, until we realized she would rather not do it. These are the major downsides of what's otherwise not a bad system, but it basically happens at least once an argument day that something goes wrong. It was the day that my, um, entire internet system went out for the entire J Comcast. And I ended up being frantic the whole day and finally had to do it on the telephone. And even that was hard to do because I couldn't get much of a signal because everybody else in Berkeley has Comcast was out also. So it was very difficult to get cellular service. There she is. I see her back. I'm back. Yes. All right. Mr. O'Connor. Um, I'm not sure who is engaging with you. I think, um, just question where I left off. I had asked you about the temporal relationship between the, she was in the trunk and there's a statement I've made about being quiet. And I'm trying to figure out, um, how much later it was. Um, and you explained there was a meeting at the Sycamore house. Uh, let me ask you once they drove her when she was in the trunk and drove her, how far did they take her? Um, you know, frankly, your honor, I don't recall. I don't recall how far that was. Um, all right. Counsel, I'll dig it out. I'll dig it out of the record. I have looked for this a quite short distance. Yeah. I think it was essentially in the same city, the city of Delhi. Um, so that much I've got, I thank you counsel. I don't want to take up any more time. Let's see. You have a little more time. So if there's anything else you'd like to address, I mean, you haven't gotten to the fact that he took her out of the car. Right. Right. Well, yeah, sure. Sure. That's another, that's another excellent fact. Um, yeah, let's see. So, so he participated in the planning session at the Sycamore house and then, um, yeah, they drove to the murder scene and that's not subject to my concern in this sense. He didn't have to say anything. I apologize, your honor. I said that is not subject to my concern because he didn't have to say anything to do that. Okay. Yes. Okay. Um, and anyway, so at the murder scene, he assisted with the removal of the victim from the trunk of the car. You know, he, he stood by as his cohorts, um, set the victim on fire. Standby goes back to the same problem. Yeah. Well, what's he going to say? I mean, I guess he, he could have run away. Is that the idea? Yeah. Well, I mean, he did, he did have, um, an opportunity to, uh, to express an objection, for example, at the planning session at the Sycamore house. All right. Now we're back to the same problem, but I mean, to me, frankly, from your point of view, the best answer to my concerns is that there was no such argument. I, no one's been arguing that it's the major, uh, participant part that the, that the duress applies to, as opposed to the underlying, um, kidnapping by itself. But in any event, I mean, I'm fairly concerned about it because at many turns, when you talk in the major participant analysis, you run into, he didn't say anything. That's what bothers me. Yeah. Well, one other thing I would like to mention about major participants, I think I may have mentioned this before, but I think it's worth reiterating is, um, defendant's, um, statement to Esparza that, uh, you know, he loaned the car to the others to prove he was not responsible for the Lotus car to the others, knowing the victim would be kidnapped. Um, and, um, um, so, and that, that comes from, um, you know, as far as us testimony and or pretrial statement that was admitted at trial. And I think that's, that's very important in terms of major participation. And, um, you know, uh, so, and I don't, I don't think that has anything to do with, uh, you know, with any threats. I don't think that he was threatened at that point, uh, you know, at the time he loaned his car. Well, Vasquez said in his post trial test, uh, uh, testimony that he was implicitly threatened because there were, Vasquez did have a gun and did, uh, essentially point to the gun when the um, yeah, as I recall, Vasquez, his declaration said he just, he just had the gun. He just displayed the gun. I don't, I did not think he ever pointed it at the, at the defendant. But I guess you're back to the same problem, which is still the verbal threat had to do with him speaking up and not with him participating in the crime. Yeah. Right. That's, that's true. Yeah. The, uh, so Valencia's threats were either threats that, um, defendants should remain quiet in the presence of the victim. So the victim did not recognize his voice or he shouldn't say that to be safe. So the victim wouldn't recognize her. Uh, no, but it was, you know, it was, um, uh, don't speak. So the victim cannot hear him. So that was, that was the threat. And then, and then also a threat not to tell other people about the crime. Um, but that's, that's not the same thing as a threat to actually participate in crime. Um, and then I just, I did want to say a few words about, uh, my supplemental 40 shin. Um, so the, uh, the opposing briefs, uh, argue and invite the court to hold de novo, uh, rather than framing the relevant question is whether a fair-minded jurist could reach a different conclusion and that's shin versus care one 41 Supreme court at 5.4. And then, uh, also the court decision has to be more than clear air. In fact, it has to be far more than even clear air. And that's shin at 5 23. And so, uh, uh, with, with that, uh, unless, unless there are any further questions, I think I'm prepared to submit the matter. Okay. Thank you very much. Thank you, your honor. Um, just one quick point on the, the duress and the threats, um, and the participant, the Vasquez's, uh, declaration is that he put his gun or his hand, um, on the gun that was in his holster. And that it was a threat to participate that if Mr. Saburo didn't participate, that he would be killed. Um, that it was an implicit threat when he did that. Um, but, but the threats, I think the threat from Valencia, when he grabs him and walks into the car, that's a threat to participate. And so I think in addition to the explicit. Exactly. It's a testimony on that. My impression was that he sort of pulled him with a sleeve, but it wasn't violent or anything. Well, I don't, I don't know that it has to be violent, um, to be a threat. He says that he, he's yelling at him. He has this raised voice, he's irritated. And then this is at, um, two ER three 58. He says he grabbed him by the sleeve and then he walks him over to the car. Um, he grabbed him and led him to the vehicle, not all the way. So he sort of grabs him and pulls him to the car because this is after Mr. Saburo sees the bottle of gasoline and he doesn't get in the car with everybody else. Everybody else just willingly walks over and Mr. Saburo isn't joining them. Um, and so that's when Valencia goes over. But I think as I argued in the briefs, when you combine it with all the other circumstances, I don't think Valencia has to say much for this to be an implicit threat, given everything else that's happening. Um, but as your honor pointed out, a lot of what the state points to is just not saying anything, um, as major participation, but some of the other things that it points to, like getting her out of the car, um, or loading his car out. Those are also things that the other people like Valencia are telling him to do. And so when you combine the duress evidence, which I'm not sure that it necessarily has to rise to a level of duress to get an instruction, to be considered a threat that would lead him to do something if we're folding it into the major participant analysis. I mean, if he's doing these things under a threat, I think that's still something relevant to consider when you're considering if he's a bank stander. Okay. Um, so the time has expired. Thank you for your arguments. Um, Sabrera versus Joe is submitted and we'll go to the last case of the day and of the week. Ingersoll versus Coca-Cola.
judges: Berzon, Christen, Bade